# UNITED STATES DISTRICT COURT
# OF NEW JERSEY

........................................................... x

CITY OF NEWARK,

                      Plaintiff,

         - against -

GEO RE-ENTRY GROUP, LLC and
ABC CORPS. (A FICTITIOUS
COMPANY) 1-100,

                 Defendants.

........................................................... x

No. 2:25-cv-02225-JKS-LDW

 

# DEFENDANT GEO'S OPPOSITION TO NEWARK'S
# MOTION FOR A PRELIMINARY INJUNCTION

**DAVIS WRIGHT TREMAINE LLP**
Geoffrey S. Brounell
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Tel: (212) 489-8230
geoffreybrounell@dwt.com

*Attorneys for Defendant*
*The GEO Group, Inc., incorrectly sued as*
*GEO Re-Entry Group, LLC*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................1

II.  BACKGROUND .......................................................................3

III.  ARGUMENT............................................................................8

    A.  There Is No Likelihood Of Success On The Merits.............................9

        1.  There is no likelihood of success because the Complaint is
            subject to dismissal pursuant to Rule 12(b)(7) and Rule 19
            or, in the alternative, requires a more definite statement
            pursuant to Rule 12(e)................................................................9

            a.  There is no likelihood of success on the merits
                because ICE is a necessary party pursuant to Rules
                12(b)(7) and 19 ...........................................................10

            b.  In the alternative, there is no likelihood of success
                on the merits because Plaintiff must file a more
                definite statement pursuant to Rule 12(e)......................13

        2.  There is no likelihood of success because GEO is immune
            from suit .....................................................................................14

            a.  GEO is immune under the doctrine of derivative
                 sovereign immunity ......................................................15

            b.  GEO is immune under the doctrine of
                 intergovernmental immunity .........................................16

                (1)  Intergovernmental immunity—direct
                     regulation............................................................16

                (2)  Intergovernmental immunity—impermissible
                     discrimination......................................................19

         3.  There is no likelihood of success because federal
            immigration law preempts Newark's attempt to enforce
            the "City Code".......................................................................20

a.      Field Preemption.............................................................20

b.      Obstacle Preemption......................................................25

B.      There Is No Irreparable Harm .............................................26

C.      Granting A Preliminary Injunction Will Result In Harm To GEO
And Will Not Serve The Public Interest In Enforcing
Immigration Laws ................................................................33

D.      If The Court Issues A Preliminary Injunction—And It Should
Not—Newark Should Be Required To Post A Bond In The
Amount Of At Least $60 Million.........................................35

IV.   CONCLUSION...............................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acierno v. New Castle County,*
  40 F.3d 645 (3d Cir. 1994) ...................................................................29

*Adams v. Freedom Forge Corp.,*
  204 F.3d 475 (3d Cir. 2000) .................................................................29

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003).............................................................................24

*Arizona v. United States,*
  567 U.S. 387 (2012)......................................................................11, 24

*Atl. City Coin & Slot Serv. Co. v. IGT,*
  14 F. Supp. 2d 644 (D.N.J. 1998)........................................................37

*Autobar Sys. of N.J. v. Berg Liquor Sys., LLC,*
  2024 WL 919183 (D.N.J. Mar. 4, 2024) ...............................................9

*Bhd. of R. R. Trainmen v. Balt. & O. R. Co.,*
  331 U.S. 519 (1947)..............................................................................12

*Boat Basin Invs., LLC v. First Am. Stock Transfer, Inc.,*
  2003 WL 282144 (S.D.N.Y. Feb. 7, 2003) ..........................................12

*Boeing Co. v. Movassaghi,*
  768 F.3d 832 (9th Cir. 2014) ...............................................................18

*Butters v. Vance Int'l, Inc.,*
  225 F.3d 462 (4th Cir. 2000) ...............................................................15

*Campbell Soup Co. v. Conagra, Inc.,*
  977 F.2d 86 (3d Cir. 1992) ..................................................................29

*Campbell-Ewald Co. v. Gomez,*
  577 U.S. 153 (2016)......................................................................15, 16

*Caplan v. Fellheimer Eichen Braverman & Kaskey,*
  68 F.3d 828 (3d Cir. 1995) ..................................................................27

*Cherry Hill Township v. Oxford House, Inc.*,
    263 N.J. Super. 25 (App. Div. 1993) ..................................................30

*City of Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ...........................................29, 30

*Continental Grp., Inc. v. Amoco Chems. Corp.*,
    614 F.2d 351 (3d Cir. 1980) .............................................................29

*CoreCivic, Inc. v. Murphy*,
    690 F. Supp. 3d 467 (2023), *appeal filed*, Case No. 23-2598
    (3d Cir. Sept. 7, 2023)......................................................................18

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
    888 F.3d 640 (4th Cir. 2018) ............................................................16

*Del. River Port Auth. v. Transam. Trailer Transp., Inc.*,
    501 F.2d 917 (3d Cir. 1974) .............................................................33

*Doe v. Christie*,
    33 F. Supp. 3d 518 (D.N.J. 2014), *aff'd sub nom. Doe ex rel. Doe v.*
    *Governor of N.J.*, 783 F.3d 150 (3d Cir. 2015) .................................10

*ECRI v. McGraw-–Hill, Inc.*,
    809 F.2d 223 (3d Cir. 1987) .............................................................28

*Elliott v. Kiesewetter*,
    98 F.3d 47 (3d Cir. 1996) .................................................................36

*Filarsky v. Delia*,
    566 U.S. 377 (2012)..........................................................................15

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
    847 F.2d 100 (3d Cir. 1988) ........................................................36, 37

*Garden State Elec. Inspection Servs. Inc. v. Levin*,
    144 F. App'x 247 (3d Cir. 2005) ......................................................31

*Gartrell Const. Inc. v. Aubry*,
    940 F.2d 437 (9th. Cir. 1991) ......................................................23, 24

*GEO Grp., Inc. v. Newsom*,
    50 F.4th 745 (9th Cir. 2022) ........................................................20, 25

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824) .................................................................25

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) .................................................................12, 25

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) .................................................................38

*Hoxworth v. Blinder, Robinson & Co.*,
    903 F.2d 186 (3d Cir. 1990) .................................................................35, 36, 37

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989) .................................................................35, 39

*Johnson v. Maryland*,
    254 U.S. 51 (1920) .................................................................17, 18

*In re KBR, Inc., Burn Pit Litig.*,
    744 F.3d 326 (4th Cir. 2014) .................................................................15

*Leslie Miller v. Arkansas*,
    352 U.S. 187 (1956) .................................................................18, 23, 24

*Mallet & Co. v. Lacayo*,
    16 F. 4th 364 (3d Cir. 2021) .................................................................8

*Marsellis-Warner Corp. v. Rabens*,
    51 F. Supp. 2d 508 (D.N.J. 1999) .................................................................31

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) .................................................................16, 17

*Mead Johnson & Co. v. Abbott Labs.*,
    201 F.3d 883, *amended on recons.*, 209 F.3d 1032 (7th Cir. 2000) .................................................................38

*Messina v. Coll. of N.J.*,
    566 F. Supp. 3d 236 (D.N.J. 2021) .................................................................27

*Murphy v. NCAA*,
    584 U.S. 453 (2018) .................................................................26

*North Dakota v. United States*,
    495 U.S. 423 (1990)..................................................................19

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
    Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002) ...................................................8

*Osborn v. Bank of the U.S.*,
    22 U.S. (9 Wheat.) 738 (1824) .............................................17

*Railway Mail Ass'n v. Corsi*,
    326 U.S. 88 (1945)..................................................................17

*Ram v. Lal*,
    906 F. Supp. 2d 59 (E.D.N.Y. 2012) ...................................12

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ...........................................8, 33

*Rosenzweig v. Brunswick Corp.*,
    2008 WL 3895485 (D.N.J. Aug. 20, 2008) .......................11

*Sorenson v. Selective Serv. Sys.*,
    203 F. Supp. 786 (E.D. Pa. 1962).......................................10

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)...............................................................13

*Sys. Operations, Inc. v. Sci. Games Dev. Corp.*,
    555 F.2d 1131 (3d Cir. 1977) .............................................37

*Tanko v. Moore*,
    2023 WL 3033573 (D.N.J. Apr. 21, 2023)........................26

*Tarek Holdings, LLC v. Shockley*,
    2022 WL 13848153 (D.N.J. Oct. 24, 2022) .......................11

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ...............................20, 25, 26

*United States v. Mitchell*,
    463 U.S. 206 (1983)...............................................................15

*United States v. Washington*,
   596 U.S. 832 (2022) .................................................................19, 20

*Warner Lambert Co. v. McCrory's Corp.*,
   718 F. Supp. 389 (D.N.J. 1989) ............................................................33

*Washington v. United States*,
   460 U.S. 536 (1983) ...............................................................................19

*Waterfront Comm'n of N.Y. Harbor v. Constr. & Marine Equip. Co.*,
   928 F. Supp. 1388 (D.N.J. 1996) ..........................................................36

*Westchester Disabled On the Move, Inc. v. County of Westchester*,
   346 F. Supp. 2d 473 (S.D.N.Y. 2004) ...................................................12

*Yearsley v. W.A. Ross Constr. Co.*,
   309 U.S. 18 (1940) ...........................................................................15, 16

*Zambelli Fireworks Mfg. Co. v. Wood*,
   592 F.3d 412 (3rd Cir. 2010) .................................................................37

## Statutes

6 U.S.C. § 112(b)(2) .............................................................................11, 21

8 U.S.C.
   § 1226(e) ...............................................................................................11
   § 1231(g)(1) ...........................................................................................20

18 U.S.C. § 4013 ........................................................................................21

28 U.S.C. § 530C(a)(4) .......................................................................11, 21

Fiscal Year (FY) 2017 Department of Homeland Security (DHS)
   Appropriations Act (Pub. L. No. 115-31, 131 Stat. 135) ......................21

N.J.S.A. 52:27D-132 ..................................................................................32

Pub. L. No. 119-4, 139 Stat. 9, 27 (2025) .................................................34

## Rules

Fed. R. Civ. P.
  12 ............................................................................................1, 9
  12(b)(7) ...................................................................1, 9, 10, 11
  12(e) ...................................................................................*passim*
  19 .........................................................................................1, 9, 10
  19(a) ..........................................................................................12
  19(a)(1)(A) ................................................................................10
  19(a)(1)(B) ................................................................................10
  65(c) ....................................................................9, 35, 36, 37

## Regulations

48 C.F.R. § 9.104-1 ...............................................................24

N.J.A.C. 5:23-2.31(d)(1) .......................................................32

## Constitutional Provisions

U.S. Const.
  Article I, § 8, cl. 3-4 ...............................................................12
  Article I, § 8, cl. 10-13 ..........................................................12
  Article VI, cl. 2 ..........................................................16, 17, 25

## Other Authorities

163 Cong. Rec. H3812 (2017) .................................................22

11A Charles Alan Wright & Arthur R. Miller, *Fed. Practice & Proc.*
  (3d ed. 2004) ..........................................................................38

City of Newark, *Mayor Ras J. Baraka's Statement on ICE Intention to*
  *Open Detention Center at Newark's Delaney Hall*, News & Updates
  (Feb. 27, 2025), https://tinyurl.com/39cb9fs8 .....................5

*Emergency Detention and Related Services Strategic Sourcing Vehicle*,
  SAM.gov, https://tinyurl.com/2bzhs6nm (last visited Apr. 15, 2025) ..............34

Eric Kiefer, *ICE Detention Center In NJ Is First To Open Under Trump's*
  *New Term*, Patch.com (Feb. 27, 2025, 12:30 PM, *updated* 10:20 PM),
  https://tinyurl.com/5h8bvz2k ...............................................4, 5

The Joint Explanatory Statement and House Report 114-668 .........................21, 22

N.J. Monitor (Apr. 1, 2025), https://tinyurl.com/4sbyzyzh ......................................7

President Donald J. Trump, *Protecting the American People Against Invasion* (Jan. 20, 2025), https://tinyurl.com/yauyxxks ....................................................34

Steve Strunsky, *'We are all immigrants': Newark rallies against massive new ICE detention center* (Mar. 11, 2025 7:45 PM, *updated* Mar. 13, 2025 7:57 AM), https://tinyurl.com/mr29pr94.....................................................6

Viet D. Dinh, Reassessing the Law of Preemption, 88 Geo. L.J. 2085 (2000).......24

Zach Blackburn, *Baraka, protesters say they'll fight against planned ICE detention center*, N.J. Globe (Mar. 11, 2025 4:41 PM), https://tinyurl.com/3rudy5eu........5

Defendant The GEO Group, Inc., incorrectly sued as GEO Re-Entry Group, LLC ("GEO"), respectfully submits this memorandum of law in opposition to the motion for a preliminary injunction filed by Plaintiff the City of Newark ("Newark").

## I.    INTRODUCTION

Newark's motion for emergency relief fails on every prong of the analysis.

First, there is no likelihood of success on the merits. It is black-letter law that a request for a preliminary injunction must be denied when a complaint is subject to dismissal under Rule 12. Yet Newark's papers do not even mention—let alone try to contest—GEO's pending motion for dismissal. *See* ECF No. 9. GEO's motion sets forth two separate reasons why this preliminary injunction motion must be denied: because Immigration and Customs Enforcement ("ICE") is a necessary party to this action under Rule 19 and Rule 12(b)(7) or, in the alternative, because the current pleading is so "vague or ambiguous" as to require a more definite statement pursuant to Rule 12(e). There can be no likelihood of success on the merits if the Complaint is subject to dismissal or re-pleading. This, by itself, warrants denial of the motion.

There is also no likelihood of success on the merits for two additional reasons, entirely separate from GEO's pending motion for dismissal: because GEO is immune from this suit under the doctrines of derivative sovereign immunity and

intergovernmental immunity and because federal law preempts Newark's attempts to enforce the "City Code" to thwart the enforcement of this country's immigration laws.  Either provides an additional and separate ground to deny the motion for a preliminary injunction.

Second, there is no irreparable harm.  Newark's lawsuit is purportedly about obtaining access to the Delaney Hall Facility (the "Delaney Hall Facility" or the "Facility") to conduct inspections.  As GEO has repeatedly explained, only ICE can grant access to the Facility.  Counsel for Newark has been in touch with ICE since April 9 (i.e., days before filing this motion), and ICE has confirmed in writing to counsel for Newark that ICE has oversight over the Facility.  *See* ECF No. 15-5 ("Fairbairn Decl.") ¶ 20, Ex. D.  Furthermore, ICE conveyed to Newark that it "will review your request [for access] and provide a reply as soon as practicable." Fairbairn Decl. Ex. D.  Accordingly, the only potential harm identified in the papers is now reparable.  Newark should simply await ICE's response to the requested access.  If that request is granted, Newark can then conduct the desired inspections and proceed with its lawsuit from there.  (Or, if Newark wants this Court to order access, it should amend its Complaint to add ICE to this lawsuit as only ICE can grant that relief.)  Any other purported harm—those involving remedies for failed inspections that have yet to occur—is too speculative and remote to constitute the requisite harm for purposes of obtaining the drastic remedy of a preliminary

injunction.  Newark has not identified a single case—and undersigned counsel is unaware of any—in which a New Jersey court has granted a preliminary injunction for purported city code violations, let alone for violations for inspections that have not yet taken place.

And turning to the harm and public interest:  this motion appears to be an attempt by Newark to fulfill the promise of Newark Mayor Ras Baraka—who is currently (and not coincidentally) a candidate for governor—that "[r]*egardless of the process*, an immigrant detention center is not welcomed here."  (emphasis added).  Rather than await a decision by ICE—or amend its Complaint to seek the requested relief from the now undisputed necessary party, ICE—Newark has filed this motion, accusing GEO of essentially failing inspections that it has yet to conduct based on the alleged lack of access GEO is unable to remedy.  It is not in the public's interest to allow this to proceed.  Newark should seek access from ICE and, if granted, conduct the inspections or, if denied, seek relief from ICE.  To hold otherwise would be to prioritize political ambitions over the public's overwhelming interest in the enforcement of this country's immigration laws.

## II.    BACKGROUND

GEO respectfully incorporates the background section from its brief in support of its motion to dismiss, *see* ECF No. 9-1 ("GEO Br.") at Section II, and repeats only the facts most relevant to Newark's motion for a preliminary injunction.

In February 2025, ICE announced the imminent reopening of the Delaney Hall Facility, and on February 27, 2025, GEO announced that it had been awarded a 15-year, fixed-price contract by ICE for secure residential support services and the exclusive use of the 1,000-bed Delaney Hall Facility (the "ICE Contract") for the establishment of a federal immigration processing center in Newark, New Jersey. *See* ECF Nos. 1-3 & 1-4.  The ICE Contract grants ICE exclusive use of the Delaney Hall Facility and provides that ICE exercise exclusive control over all access to secure portions of the facility.  *See* ECF No. 2 ("Tatum Aff.") ¶ 4.  All requests for access to the secure portions of the Delaney Hall Facility must obtain pre-clearance approvals by ICE, including all requests for access by federal and state employees, as well as GEO employees.  *See id*. ¶ 10.

Almost immediately after ICE announced the imminent reopening of the Delaney Hall Facility, New Jersey elected officials vowed to "fight like hell" and "fight to the death" against federal immigration enforcement in New Jersey.  Eric Kiefer, *ICE Detention Center In NJ Is First To Open Under Trump's New Term*, Patch.com (Feb. 27, 2025, 12:30 PM, *updated* 10:20 PM), https://tinyurl.com/5h8bvz2k.  U.S. Rep. LaMonica McIver, who represents Newark and other 10th District municipalities in the House of Representatives, decried the announcement from ICE:

> The Delaney Hall contract is in direct opposition to the will of the people here in Newark, she said.  I denounced the potential opening of

this facility earlier this month alongside my colleagues from New Jersey because privately owned detention centers degrade public trust in our institutions—the lack of transparency often leads to poor conditions and longer sentences.

*Id.*

Similarly, Newark Mayor Ras Baraka, a candidate for New Jersey governor, has vowed to block federal immigration detention at the Delaney Hall Facility:

> ***Regardless of the process***, an immigrant detention center is not welcomed here. ICE's stated intention to round up 'criminals' is a thin veil that does not conceal their scheme to violate people's rights, desecrate the Constitution, and disassemble our democracy.

City of Newark, *Mayor Ras J. Baraka's Statement on ICE Intention to Open Detention Center at Newark's Delaney Hall*, News & Updates (Feb. 27, 2025), https://tinyurl.com/39cb9fs8. (emphasis added). On March 11, 2025, Mayor Baraka appeared outside the Delaney Hall Facility with about 300 immigrants' rights advocates and other opponents of the facility demonstrating in the parking lot. According to media reports:

> The mayor said progressives must resist Republican leaders not just on immigration but also on issues like Medicaid and diversity, equity, and inclusion, which he says are under attack.
>
> This is what we do in our community in Newark, because this is a city of immigrants, Baraka said. It has always been a city of immigrants, and a city of working people, and a port city trying to find a journey towards democracy.

Zach Blackburn, *Baraka, protesters say they'll fight against planned ICE detention center*, N.J. Globe (Mar. 11, 2025 4:41 PM), https://tinyurl.com/3rudy5eu. Mayor

Baraka also reportedly vowed to **padlock the building if necessary** to block federal operation of the Delaney Hall Facility:

> Newark Mayor Ras J. Baraka said Tuesday that the private owner of an immigrant detention center lacks city planning board approval and a certificate of occupancy to open, and that his administration will file a lawsuit and ***padlock the building if necessary*** to block its opening without the necessary approvals.

Steve Strunsky, *'We are all immigrants': Newark rallies against massive new ICE detention center*, NJ.com (Mar. 11, 2025 7:45 PM, *updated* Mar. 13, 2025 7:57 AM), https://tinyurl.com/mr29pr94 (emphasis added).

On March 31, 2025, Mayor Baraka and Newark representatives requested entry to the Delaney Hall Facility to conduct inspections. Tatum Aff. ¶¶ 5-6. GEO communicated Newark's demand to ICE. *See id.* ¶ 8. ICE instructed that the City of Newark officials would need to schedule an appointment with ICE. *Id.* GEO advised the City of Newark officials of this instruction, but they declined to make the appointment at that time. *See id.* ¶ 9. Instead, Newark filed suit in New Jersey state court, which was accompanied by a coordinated mass press release.[1] GEO

---

[1] *See*, *e.g.*, Ricardo Kaulessar, *Newark says prison company blocked inspectors from checking new ICE detention center*, USA Today (Apr. 2, 2025), https://tinyurl.com/bdnnb65c; *Newark mayor says city is suing ICE to block immigrant detention center*, NJ.com (Apr. 01, 2025), https://tinyurl.com/44xvbk6b; Zach Blackburn, *Newark says private-prison firm is illegally renovating migrant detention center*, N.J. Globe (Apr. 1, 2025), https://tinyurl.com/3ukcyz4z; *City files lawsuit against GEO Group for Delaney Hall inspection violations*, Citizen Portal (Apr. 1, 2025), https://tinyurl.com/27rzx2ny; Sophie Nieto-Munoz, Newark wants judge to give

subsequently removed the case to this Court.  *See* ECF Nos. 1-5.  In a call with the Court on April 4, counsel for Newark indicated a changed desire to now contact ICE to schedule the appointment to access the Facility.  *See* Fairbairn Decl. ¶ 11; ECF No. 6.  After some back and forth—including the provision of phone numbers that did not work apparently because ICE's "phone system went down," Fairbairn Decl. ¶ 20, Ex. D—counsel for Newark made contact with a representative from ICE on April 9, 2025.  As part of those communications, ICE both confirmed that it controls access to the Facility and conveyed to Newark that it "will review your request [for access] and provide a reply as soon as practicable."  *Id.,* Ex. D.

Notwithstanding those representations, Newark filed this motion for emergency relief, seeking access to the Facility even though there is no dispute that ICE—not GEO—controls that access, and seeking remedies for purported violations of codes for inspections that have admittedly not yet been conducted.  For the reasons stated below, the Court should deny the motion.  But if the Court were to grant the requested relief, it should require Newark to post a bond in at least the amount of $60 million, which is the ***minimal*** harm GEO will suffer if it were unlawfully enjoined by granting this motion for a preliminary injunction.  *See* Declaration of Amber Martin ("Martin Decl.") ¶ 5.

---

city officials access to proposed migrant jail, N.J. Monitor (Apr. 1, 2025), https://tinyurl.com/4sbyzyzh.

## III.   ARGUMENT

In the Third Circuit, a preliminary injunction is "an extraordinary remedy which should be granted only in limited circumstances." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)).  Requests for preliminary injunctive relief are evaluated under a well-established four-factor test under which the court first considers whether the party seeking preliminary injunctive relief has demonstrated (1) a likelihood of success on the merits; and (2) that it will suffer irreparable harm absent such injunctive relief.  *Mallet & Co. v. Lacayo*, 16 F. 4th 364, 380 (3d Cir. 2021).  Only if the moving party establishes both of these threshold factors does the court go on to consider the balancing of equities, including (3) whether granting preliminary injunctive relief will harm the nonmoving party or other interested persons; and (4) the public interest.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017). The Court must then determine, in its sound discretion, whether the balance of these factors weighs in favor of granting the requested preliminary injunctive relief.  *Id*.

In this case, Newark fails to establish any of these elements.  There is no likelihood of success for three separate reasons: (1) the Complaint is subject to mandatory dismissal or repleading; (2) GEO is immune from this suit under the doctrines of derivative sovereign immunity and intergovernmental immunity; and

(3) federal preemption applies.  There is likewise no irreparable harm because access to the facility requires ICE—not GEO—and ICE has stated it is currently considering Newark's request for access.  The other purported harm, which involves alleged code violations based on inspections that have admittedly not yet occurred, is too speculative and remote to constitute the sort of harm necessary to grant injunctive relief.  The equities also strongly favor GEO because granting the injunctive relief of shutting down the Facility would devastate the public interest by putting the political ambitions of Newark's mayor above the overwhelming public interest in facilitating the enforcement of this country's immigration laws.

If this Court were to issue a preliminary injunction—and for the reasons just stated, it should not—Rule 65(c) mandates that Newark post a bond in the amount of the expected harm if the preliminary injunction were to be overturned.  In this case, that amount is ***at least*** $60 million, which is merely one year of expected revenue from the Facility's operation.

## A.    There Is No Likelihood Of Success On The Merits

### 1.    There is no likelihood of success because the Complaint is subject to dismissal pursuant to Rule 12(b)(7) and Rule 19 or, in the alternative, requires a more definite statement pursuant to Rule 12(e)

It is black-letter law (and common sense) that there is no likelihood of success on the merits if a Complaint is subject to dismissal or repleading pursuant to a Rule 12 motion.  *See Autobar Sys. of N.J. v. Berg Liquor Sys., LLC*, 2024 WL 919183, at

*5 n.9 (D.N.J. Mar. 4, 2024); *see also, e.g.*, *Doe v. Christie*, 33 F. Supp. 3d 518, 522 n.3 (D.N.J. 2014) (holding that if a plaintiff's claims "cannot survive ... [a] motion[ ] to dismiss, [the plaintiff] would necessarily be unable to make a showing of likelihood of success on the merits in support of their preliminary injunction"), *aff'd sub nom. Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150 (3d Cir. 2015).  Here, for the reasons stated in the pending motion for dismissal, *see* ECF No. 9, ICE must be joined as a necessary party and the Complaint must be dismissed with prejudice pursuant to Rule 12(b)(7) and Rule 19, or, in the alternative, Newark must be ordered to file a more definite statement pursuant to Rule 12(e).  Newark—tellingly—does not even address these grounds for dismissal in its motion for a preliminary injunction.  But either ground merits denial of Newark's motion at this time.

> **a.    There is no likelihood of success on the merits because ICE is a necessary party pursuant to Rules 12(b)(7) and 19**

Newark cannot demonstrate a likelihood of success on the merits because, as explained in more detail in its motion for dismissal, *see* GEO Br. at 12-26, its entire Complaint is subject to dismissal under Rule 19(a)(1)(A) & (B) on the grounds that it failed to join ICE as a necessary and indispensable party.  Accordingly, any motion for preliminary injunction is fatally premature until Newark joins ICE.  *See, e.g.*, *Sorenson v. Selective Serv. Sys.*, 203 F. Supp. 786, 793 (E.D. Pa. 1962) (dismissing complaint and refusing to pass on question of injunctive relief where "defendants whose actions are sought to be challenged are, in literal fact, indispensable to any

consideration of the question" before Court in complaint but were not joined as parties to action).

ICE must be joined as a necessary and indispensable party because it is undisputed that the relief Newark seeks through this action—namely, inspection rights to the Delaney Hall Facility in order to conduct inspections—can only be authorized by ICE. *See* Fed. R. Civ. P. 12(b)(7); 19(a)(1)(A)-(B); *see, e.g.*, *Tarek Holdings, LLC v. Shockley*, 2022 WL 13848153, at *5 (D.N.J. Oct. 24, 2022) (complaint subject to dismissal under Rule 12(b)(7) because complete relief was not possible without absent party and their joinder would have destroyed diversity jurisdiction); *Rosenzweig v. Brunswick Corp.*, 2008 WL 3895485, at *10 (D.N.J. Aug. 20, 2008) (complaint subject to dismissal under Rule 12(b)(7) because complete relief was not possible without absent party and contract required adjudication of claims in Connecticut).

Furthermore, ICE holds significant and material federal interests in the regulation of immigration, and therefore must be included in these proceedings. 6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4); 8 U.S.C. § 1226(e). Proceeding in this case without ICE to represent and address these dominant federal interests with foreign policy implications would undoubtably impair and impede those interests. *Arizona v. United States*, 567 U.S. 387, 394-95 (2012) ("*Arizona II*") ("[F]oreign countries concerned about the status, safety, and security of their nationals in the

11

United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States."); *Hines v. Davidowitz*, 312 U.S. 52, 64-66, 73 (1941) (characterizing "the treatment of aliens, in whatever state they may be located" as a "a *matter of national moment*") (emphasis added); *see generally* U.S. Const. art. I, § 8, cl. 3-4, 10-13.

Because joinder of ICE is necessary before any emergency preliminary relief is granted, the Court should deny Newark's motion. *See Ram v. Lal*, 906 F. Supp. 2d 59, 79 (E.D.N.Y. 2012) ("[T]he Court finds that the State Court and the Receiver are necessary parties to the action and must be before this Court in order to effectuate the requested injunction."); *Westchester Disabled On the Move, Inc. v. County of Westchester*, 346 F. Supp. 2d 473, 479-80 (S.D.N.Y. 2004) (denying motion for a preliminary injunction because where "[t]he currently named [d]efendants could not provide complete relief sought by [p]laintiffs ... [the p]laintiffs cannot establish a likelihood of success on the merits"); *Boat Basin Invs., LLC v. First Am. Stock Transfer, Inc.*, 2003 WL 282144, at *1 (S.D.N.Y. Feb. 7, 2003) ("In the absence of ... a necessary party under Rule 19(a) of the Federal Rules of Civil Procedure, the merits may not be reached and a preliminary injunction may not be granted."); *see also Bhd. of R. R. Trainmen v. Balt. & O. R. Co.*, 331 U.S. 519, 523-24 (1947) (reversing denial of motion to intervene for purpose of moving to dismiss and challenging preliminary injunction entered in absence of indispensable party).

> **b.    In the alternative, there is no likelihood of success on the merits because Plaintiff must file a more definite statement pursuant to Rule 12(e)**

In the alternative, the motion should be denied for a separate and independent reason:  because the current pleading is too vague and/or ambiguous to put GEO on notice of Newark's true claims.  As a result, there can be no likelihood of success on claims so poorly drafted that they require repleading.

GEO has already sought a more definite statement of Newark's claims under Rule 12(e), which provides that when a pleading is "so vague or ambiguous that the party cannot reasonably prepare a response," the moving party is entitled to a more definite statement.  As is the case here, "[i]f a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-14 (2002).

As noted in GEO's motion papers, *see* GEO Br. at 26-29, the Complaint does not cite to any actual provisions of code despite alleging two counts of "Violation of City Code."  The various declarations submitted in connection with this motion—which are by definition not part of the pleading anyway—add only confusion as to what is attempting to be alleged.  The Wooden and Alsbrook Declarations, for example, refer to specific sections of the "New Jersey Administrative Code" and suggest that GEO may have engaged in certain health and food violations, *see* ECF

13

No. 15-1 ("Wooden Decl.") ¶ 15, ECF No. 15-3 ("Alsbrook Decl.") ¶¶ 6-7, 10—but there is no allegation that food is currently being served at the Facility. *See generally* Compl. Similarly, the Saleem Declaration filed in support of this motion states that Saleem was unable to access Delaney Hall for the purpose of conducting an inspection but nonetheless issued four "fire code" violations, *see* ECF No. 15-2 ("Saleem Decl.") ¶ 7—which are similarly not identified in the Complaint. The cited violations by Saleem do not make any sense in any event. *See id.* (citing to Code Section 1203.4.2.1, which requires an annual testing of an emergency generator but makes explicit that the inspection is done by a service technician, not the municipality); *see also id.* (citing to Code Section 3201.4, which involves "high-piled combustible storage" that the declarant has never seen).

In sum, the Complaint fails to set forth sufficient allegations that would place GEO—or the Court—on notice as to the actual claims at issue. And the various declarations (which are not part of the Complaint) do nothing to help. Newark cannot show a likelihood of success on the merits of claims so "vague or ambiguous" that they must be re-pleaded pursuant to Rule 12(e).

### 2.    There is no likelihood of success because GEO is immune from suit

Third, there is no likelihood of success on the merits because GEO—as a private contractor to ICE—is immune from suit under the doctrines of derivative sovereign immunity and intergovernmental immunity.

### a.    GEO is immune under the doctrine of derivative sovereign immunity

"The United States may not be sued without its consent." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  It is therefore immune from suit unless a plaintiff can point to a statute that says otherwise. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165-66 (2016); *Mitchell*, 463 U.S. at 212 ("[T]he existence of consent is a prerequisite for jurisdiction.").  Similarly, government contractors may not be sued for carrying out the sovereign's will. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20 (1940); *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 341-43 (4th Cir. 2014) (private employees receive Yearsley immunity (a/k/a derivative sovereign immunity or "DSI") when performing same functions as government employees); *see generally Filarsky v. Delia*, 566 U.S. 377 (2012) ("[I]t should come as no surprise that the common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities."). *Id.* at 387.  That is because the government has an "unquestioned need to delegate [its] functions," and because "[i]mposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (internal quotation marks and citation omitted).

Thus, "a government contractor is not subject to suit if (1) the government

authorized the contractor's actions and (2) the government 'validly conferred' that authorization." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 646 (4th Cir. 2018) (quoting *In re KBR*, 744 F.3d at 342 (citing *Yearsley*, 309 U.S. at 20-21)). In *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), the U.S. Supreme Court affirmed the two-prong *Yearsley* standard and explained the standard as follows: "[w]here the Government's 'authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress,' we explained, 'there is no liability on the part of the contractor' who simply performed as the Government directed." *Id.* at 167 (quoting *Yearsley*, 309 U.S. at 20-21).

As a result, GEO is immune from any suit for carrying out the sovereign's will, including but not limited to explaining that Newark requires ICE's permission to access the Facility.

### b.    GEO is immune under the doctrine of intergovernmental immunity

### (1)    Intergovernmental immunity—direct regulation

The Supremacy Clause provides that the "Laws of the United States" made in pursuance of the Constitution "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. More than 200 years ago, in the foundational case of *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), the Supreme Court recognized that this guarantee of federal supremacy would be meaningless if the federal government

were not immune from regulation and taxation by the states. The Supreme Court held that the supremacy of the federal government within its legitimate sphere of action necessarily meant that the states had no power to interfere with a constitutionally valid federal activity. *Id.* at 427-30. In line with *McCulloch*'s prohibition on state laws that "retard, impede, burden, or in any manner control, the operations" of the federal government, *id.* at 436, a state law directly regulates the federal government—and is therefore unconstitutional—if it "involve[s] a direct, physical interference with federal activities ... or some direct, immediate burden on the performance of the [federal] functions." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945) (citing cases). In assessing whether a state law substantially burdens federal operations, there is no distinction between state regulation of federal employees and state regulation of private contractors carrying out federal operations. In *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738 (1824), the Supreme Court declared that "the right of the State to control [a federal contractor's] operations, if those operations be necessary to its character, as a machine employed by the government, cannot be maintained." *Id.* at 867 (Marshall, C.J.).

The Supreme Court has consistently relied on the Supremacy Clause to strike down state laws that dictate how the federal government carries out its functions. In *Johnson v. Maryland*, Maryland sought to require a federal postal employee to comply with a state licensing regime before he could perform his federal duties. 254

U.S. 51, 55 (1920).  In holding the state law unconstitutional, the Court observed:

> [T]he immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on.

*Id.* at 57.

In *Leslie Miller, Inc. v. Arkansas*, the Supreme Court struck down an Arkansas law that prevented a contractor selected by the federal government from bidding, contracting, and commencing work on a military base "without having obtained a license under Arkansas law for such activity."  352 U.S. 187, 188 (1956) (per curiam).  The Court, in rejecting the state law, reasoned that "[s]ubjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review" over the federal government's determination of who was qualified to perform federal work.  *Id.* at 190.

Following this precedent, courts have held that intergovernmental immunity forbids a state from substantially interfering with federal activity carried out by a private contractor, even where the activity occurs on private land.  *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).  Through the application of the Newark municipal code, Newark is likewise attempting to override ICE's contract award decision and the selection of the Delaney Hall Facility in violation of the Intergovernmental Immunity Doctrine.  *Cf. CoreCivic, Inc. v. Murphy*, 690 F. Supp.

18

3d 467, 494 (2023) (New Jersey law preventing ICE from contracting with private immigration detention facilities violated the Intergovernmental Immunity Doctrine), *appeal filed*, Case No. 23-2598 (3d Cir. Sept. 7, 2023).

### (2) Intergovernmental immunity—impermissible discrimination

The United States Supreme Court recently confirmed that the doctrine of Intergovernmental Immunity prohibits state laws that either "regulat[e] the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838-39 (2022) (alterations in original) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)). A state law impermissibly discriminates against the federal government or its contractors if it "single[s them] out" for less favorable "treatment," *Washington v. United States*, 460 U.S. 536, 546 (1983), or if it regulates them unfavorably on some basis related to their governmental "status," *North Dakota*, 495 U.S. at 438 (plurality opinion). Preventing discrimination against the federal government or those with whom it deals lies at the heart of the Constitution's intergovernmental immunity doctrine. *United States v. Washington*, 596 U.S. at 840.

Newark's current attempts to block federal immigration operations at the Delaney Hall Facility plainly represent a stark and unmistakable attempt to thwart federal operations through the less favorable treatment of ICE and its contractor GEO under local, State, and administrative requirements. This type of unequal and

discriminatory enforcement of laws is unconstitutional. *United States v. California*, 921 F.3d 865, 883-84 (9th Cir. 2019) *see also GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 760 (9th Cir. 2022) ("Enforcement of the substance of [the regulation] against the contractors would have the same effect as direct enforcement against the Government.") (alteration in original).  Newark's attempt to enter the Delaney Hall Facility ostensibly to investigate compliance with local, State, and administrative codes is unconstitutional and invalid because it impermissibly discriminates against the federal government and its contractors. *United States v. Washington*, 596 U.S. at 835-36.

### 3. There is no likelihood of success because federal immigration law preempts Newark's attempt to enforce the "City Code"

Third, there is no likelihood of success because federal immigration law preempts Newark's attempt to enforce the "City Code" in this case.

#### a. Field Preemption

Federal immigration law provides that the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and "[w]hen United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the [Secretary] may expend ... amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities ... necessary for detention." 8 U.S.C. § 1231(g)(1).  To effectively arrange for appropriate places of detention for

removal aliens, Congress further granted the Secretary authority "to make contracts ... as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties.   Congress also granted authority to "carr[y] out," "in the reasonable discretion of the Attorney General," the activities of ICE "through any means, including … through contracts, grants, or cooperative agreements with non-Federal parties[,]" except to the extent that such agreements are otherwise precluded by federal law.  28 U.S.C. § 530C(a)(4).  In 2000, Congress enacted a statute stating: "[n]otwithstanding any other provision of this section, the Attorney General hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis."  18 U.S.C. § 4013, note.   18 U.S.C. § 4013 also specifically denotes the contemplated contracts authorized by Congress under this section is to include "Contracts for Space *or Facilities*."  (emphasis added).

Federal statutory directives and a comprehensive set of federal detention standards known as the Performance Based National Detention Standards ("PBNDS") often govern GEO's operation of private detention facilities.  The current PBNDS were implemented and incorporated into ICE contracts at the direction of Congress.  The Joint Explanatory Statement and House Report 114-668, which accompany the Fiscal Year (FY) 2017 Department of Homeland Security

(DHS) Appropriations Act (Pub. L. No. 115-31, 131 Stat. 135), evince this direction. The Joint Explanatory Statement says: "[w]ithin 45 days after the enactment of this Act, ICE shall report on its progress in implementing the 2011 Performance Based National Detention Standards, including the 2016 revisions." 163 Cong. Rec. H3812 (2017). House Report Number 114-668 states: "[w]ithin 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 [PBNDS] and requirements related to [PREA], including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance." H.R. Rep. No. 114-668, at 35.

For Delaney Hall, while the PBNDS were included in the solicitation released by ICE at the start of the contracting process, the National Detention Standards ("NDS") are what now control. The NDS, originally issued by ICE's precursor agency Immigration and Naturalization Service ("INS"), also serve to establish conditions of confinement and expectations for detention. The NDS streamlines many of the requirements set forth in the PBNDS.

That the PBNDS and the NDS provide for general compliance with applicable federal, state and local laws regarding safety and sanitation, fire safety, and fire prevention—or that ICE generally reaffirmed those requirements, to the extent applicable—does not mean that Newark enjoys broad and unrestrained discretion to

inspect those facilities. There is significantly no requirement in the PBNDS or NDS that Newark or the municipality conduct such inspections. Rather, those external inspections are routinely conducted not by municipalities, but by authorized and qualified third parties. *See* Long Decl. ¶¶ 4-5. And that is precisely what GEO has done: a third-party inspection was conducted as recently as April 11. *Id.* ¶ 5.

On this point, *Leslie Miller v. Arkansas*, 352 U.S. 187 (1956) (per curiam) and *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991) are instructive. In *Leslie Miller*, a contractor was prosecuted and fined by the state for working as a contractor without having obtained an Arkansas contractor's license. The fine was upheld by the Arkansas state courts. On appeal, the United States Supreme Court reversed. The Supreme Court found that the Arkansas statute requiring licensing of the contractor interfered with the federal government's power to select contractors and to schedule construction and, therefore, was in conflict with the federal law regulating procurement. *Id.* at 188. The Supreme Court went on to find the Arkansas state law requirements regarding contractor licensure were preempted because "similar grounds for licensing under the state statute and for finding 'responsibility'" are enumerated under the federal statute. *Id.* at 189-90. The Supreme Court further reasoned that application of such contractor licensing requirements to the federal government's preferred contractor would also "frustrate the expressed federal policy of selecting the lowest responsible bidder." *Id.* at 189-90.

In *Gartrell*, the Ninth Circuit found, citing *Leslie Miller*, that a federal contract provision requiring contractor to obtain "necessary" licenses and comply with "applicable" state laws was nonetheless preempted by federal law.  940 F.2d at 438-39.  The Ninth Circuit reasoned that preemption precluded enforcement of state laws requiring contractor licenses because enforcement of such state laws would effectively supplant the federal government's "responsibility" determination for its selected federal contractor under 48 C.F.R. § 9.104-1 (requiring prospective contractors to have adequate financial resources, to be able to comply with the performance schedule, to have a satisfactory record of integrity and business ethics). *Id.* at 439-40.

So, too, here.  The comprehensive framework enacted by Congress regarding the detention of aliens for removal leads to the conclusion that the federal government has occupied the field—and that attempts to regulate such contractors by state governments frustrates and conflicts with the federal government's federal interests in the regulation of immigration (and procurement of federal contractors who support those initiatives). *See Leslie Miller*, 352 U.S. at 187-90; *Gartrell*, 940 F.2d at 438-40; *Arizona II*, 567 U.S. at 401 (2012); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419-20, n.11 (2003); *see also* Viet D. Dinh, *Reassessing the Law of Preemption*, 88 Geo. L.J. 2085, 2098-99, 2107 (2000).  Where Congress occupies an entire field, as it has in the field of alien detention pending removal, even

complementary state regulation is impermissible.  Accordingly, Newark's attempts to enter the Delaney Hall Facility to conduct inspections are unconstitutional and invalid because they are preempted by Congress' occupation of the entire field of alien detention pending removal.  *See Newsom*, 50 F.4th at 761-63.

### b.    Obstacle Preemption

As early as *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), Chief Justice Marshall stated the governing principle—that "acts of the State Legislatures … [which] interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution," are invalid under the Supremacy Clause.  *Id.* at 211.  More than 100 years later Justice Black, after reviewing the precedents, wrote in a similar vein that while:

> [t]his Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. … In the final analysis, … [o]ur primary function is to determine whether [a challenged state statute] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Hines*, 312 U.S. at 67 (footnotes omitted).  Under the doctrine of conflict preemption, "state laws are preempted when they conflict with federal law."  *California*, 921 F.3d at 878-79 (quoting *Arizona II*, 567 U.S. at 399).  This includes cases where "compliance with both federal and state regulations is a physical impossibility" and those instances where the challenged state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 879 (quoting *Arizona II*, 567 U.S. at 399) (internal quotation marks omitted); *Murphy v. NCAA*, 584 U.S. 453, 471-72 (2018).

Newark's apparent assertion of authority to override ICE's determination that the Delaney Hall Facility meets ICE's requirements presents a direct conflict with the objectives of Congress. Allowing Newark to exercise a virtual power of review over ICE's contracting decision through the discriminatory application of local, State, and administrative codes stands as an impermissible obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

**B.    There Is No Irreparable Harm**

"Demonstrating irreparable harm is perhaps the single most important prerequisite for issuing a preliminary injunction." *Tanko v. Moore*, 2023 WL 3033573, at *2 (D.N.J. Apr. 21, 2023). Newark asserts two categories of alleged irreparable harm here: (1) limitation on Newark's attempts to obtain inspection access to the Delaney Hall; and (2) purported violations of "City Code"—made without any of the required inspections. Neither demonstrates the irreparable harm needed to justify injunctive relief.

On the first point, it is undisputed that ICE—not GEO—controls access to the Facility, including inspection rights. *See, e.g.*, Tatum Aff. ¶ 10. Counsel for Newark has been in touch with a representative from ICE since April 9, 2025. *See* Fairbairn

Decl. ¶ 16.  ICE confirmed to Newark that it controls access to the facility and further conveyed that "will review your request [for access] and provide a reply as soon as practicable."  Fairbairn Decl. ¶ 20, Ex. D.  Accordingly, there is no irreparable harm because the issue about which Plaintiff complains is both immediately reparable—simply await a decision from ICE—and self-inflicted, in that Plaintiff has improperly sought relief in this lawsuit from GEO, a party that does not control inspection access to the facility.  *See, e.g.*, *Messina v. Coll. of N.J.*, 566 F. Supp. 3d 236, 249 (D.N.J. 2021) (finding that plaintiffs faced no irreparable harm because they had the option to avoid the alleged loss, but declined to take it); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable.") (citing 11A Charles Alan Wright & Arthur R. Miller, Fed. Practice & Proc. § 2948.1 (3d ed. 1995)).

The second category of alleged harm—for various alleged code violations—similarly fails to demonstrate irreparable harm.  Newark has accompanied its motion for emergency relief with various declarations from city officials.  Yet each declaration explicitly concedes under oath that there has been no actual inspection of the Facility, and there is accordingly no foundation to support the so-called code violation findings.  *See, e.g.*, Wooden Decl. ¶¶ 14, 16 ("The owner's representative denied us entry into the building" resulting in "the lack of an inspection[.]"); Saleem Decl. ¶¶ 5, 8 ("[A] security guard denied us access to test the elevator recall"

resulting in "the lack of an inspection[.]"); Alsbrook Decl. ¶ 4 ("[W]e tried to gain entry into the facility but were denied entry by security[.]").

As a result—and unsurprisingly given these admissions—the alleged violations identified in the declarations run the gamut from those apparently observed from the outside of the building, *see* Wooden Decl. ¶ 9 ("While at the property, we observed what appeared to be new construction of an annex to the existing building and code violations related to electrical wiring and plumbing[.]"), to the inapplicable and un-pleaded, *see* Saleem Decl. ¶ 7 (citing to Code Section 1203.4.2.1, which requires an annual testing of an emergency generator but makes explicit that the inspection is done by a service technician, not the municipality), to the purely chimerical, *see* Alsbrook Decl. ¶¶ 11-14 (alleging the hypothetical possibility of various foodborne illnesses for food), Saleem Decl. ¶ 7 (citing to Code Section 3201.4, which involves "high-piled combustible storage" that the declarant has never seen).

These purported harms—of dubious code violations for failed inspections that have yet to occur—are too remote and speculative to warrant emergency and preliminary injunctive relief. Merely "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw--Hill, Inc.*, 809 F.2d 223, 225 (3d Cir. 1987) (citation omitted). Put differently, the Third Circuit has repeatedly "insisted that the

risk of irreparable harm must not be speculative." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000); *see also, e.g., Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994).

> [M]ore than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a "clear showing of immediate irreparable injury," or a "presently existing actual threat; (an injunction) may not be used simply to eliminate a possibility of a remote future injury."

*Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (internal citations omitted) (quoting *Ammond v. McGahn*, 532 F.2d 325, 329 (3d Cir. 1976) and *Holiday Inns of Am., Inc. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969)); *see also Campbell Soup Co. v. Conagra, Inc.*, 977 F.2d 86, 91-92 (3d Cir. 1992) (establishing some remote risk of irreparable harm not enough).

Newark's brief—significantly—does not cite to *a single case* in which a court granted a preliminary injunction due to purported "City Code" violations—let alone for violations based on inspections that have yet to occur. The only case cited for something beyond a principle of black-letter law on this point is *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017), *see* Br. at 13. That case had nothing to do with purported code violations. Rather, it addressed the United States' attempt to revoke monetary grants to Philadelphia's status as a so-called "sanctuary city." On these facts—radically different from the one presented to this Court—the Court concluded that Philadelphia had satisfied the irreparable harm prong of the analysis

because it faced a "'Hobson's Choice' between, on the one hand, complying with a law it credibly believes is unconstitutional, and on the other hand, foregoing funds it plans to use for life-saving projects" *Id.* at 657. Suffice to say, the case before this Court presented a wholly dissimilar fact pattern.

Undersigned counsel is likewise unaware of a single case in which a Court has granted injunctive relief on these or similar facts. To the contrary, the closest analogue located held the opposite. In *Cherry Hill Township v. Oxford House, Inc.*, 263 N.J. Super. 25, 30 (App. Div. 1993), the Township of Cherry Hill attempted to enforce its zoning ordinance and argued that two groups of recovering alcohol and substance abusers did not have a right to live together in a single-family residence in Cherry Hill Township because they did not satisfy the definition of a "family." The Appellate Division concluded that the mere potential violation of an ordinance did not constitute "irreparable harm" in New Jersey, holding that "there was no irreparable harm to the Township. There concededly had been no problems with the residents of Oxford House: no arrests, no police involvement, no registered complaints, nothing." *Id.* at 43. In other words, the purported harm of an alleged ordinance violation by itself is not sufficient to satisfy the irreparable harm prong absent some sort of ***other*** identified harm.

Indeed, the holding in *Oxford House* aligns with the inevitable conclusion that the type of code violations referenced in Newark's accompanying declarations—by

themselves—cannot constitute irreparable harm as a matter of law. "The word irreparable connotes that which cannot be repaired, retrieved, put down again or atoned for." *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 528 (D.N.J. 1999) (cleaned up). "As such, [Newark] must demonstrate that, absent the issuance of a preliminary injunction, it will suffer harm which cannot be redressed sufficiently following a trial of the matter." *Id.* That is not the case here. Absent any allegation that code violations are actually causing some harm to some person through the violation—which neither the Complaint nor the motion papers actually alleges— violations of the sort mentioned in Newark's papers are definitionally something that can be "repaired" after a resolution of the matter on the merits, i.e., through a court order to comply with the code.

And in this case, Newark is ignoring the very procedure set forth in the law to obtain the requested relief of a "cease occupancy and construction" order. "The State Uniform Construction Code … establishes uniform construction standards and enforcement policies for the State of New Jersey in specific areas such as plumbing, electrical, building, and fire prevention." *Garden State Elec. Inspection Servs. Inc. v. Levin*, 144 F. App'x 247, 249 (3d Cir. 2005). Although the governing pleading fails to cite to a single provision of code, the declarations accompanying Newark's current motion cite to various provisions of the Uniform Construction Code. Presumably, therefore, Newark is seeking relief under that Code. But part of the

emergency relief it seeks—an order that GEO "cease occupancy and construction," *see* ECF No. 15-10—requires Newark to issue a proper "stop construction order" that identifies in writing the purported code violation and states the conditions upon which construction be resumed.

Specifically, the Uniform Construction Code states that an "enforc[ement] agency may issue a stop construction order in writing which shall state the conditions upon which construction may be resumed." N.J.S.A. 52:27D-132. The binding regulations adopted by the Department of Community Affairs, however, go further:

> If the construction of a structure or building is being undertaken contrary to the provisions of the regulations, or other applicable laws or ordinances, *the enforcing agency may issue a stop construction order in writing which shall state the reasons for such order and the conditions under which construction may be resumed and which shall be given to the owner or the holder of the construction permit or to the person performing the construction.*

N.J.A.C. 5:23-2.31(d)(1) (emphasis added). In this case, none of these conditions were met. The only document that GEO received were two identical "Stop Construction" notices that did not "state the reasons for such order" or "the conditions under which construction may be resumed." *Id.*; *see* Long Decl. ¶ 7 & Ex. A.

Accordingly, and for all of the reasons just stated, there is no irreparable harm here. The record is undisputed that access to the Facility requires ICE's permission, not GEO's—and ICE is currently considering Newark's request for access. Any

other requested relief based on purported code violations for inspections not yet conducted is putting the cart before the horse. Even ignoring all of the other defenses that GEO has articulated, Newark at the minimum needs to conduct an inspection, identify any possible violations of code, provide the proper notice, and then it can seek the relief of a "cease occupancy and construction" order—in other words, the process that the City of Newark would follow in any other case not involving a politically charged federal immigration processing center like Delaney Hall.

## C. Granting A Preliminary Injunction Will Result In Harm To GEO And Will Not Serve The Public Interest In Enforcing Immigration Laws

Only if the Court concludes that Newark has shown likelihood of success on the merits and irreparable harm—and for the reasons just stated, it has not—the Court may also consider two additional factors: (1) "the possibility of harm to other interested persons from the grant or denial of the injunction," and (2) "the public interest." *Del. River Port Auth. v. Transam. Trailer Transp., Inc.*, 501 F.2d 917, 920 (3d Cir. 1974); *see also, e.g., Reilly*, 858 F.3d at 176 (reiterating this standard); *Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 399 (D.N.J. 1989) ("In considering any motion for preliminary injunctive relief, a court should consider whether granting the requested relief will result in greater harm to the party on whom it is imposed than its denial will have on the party who seeks it.").

It is undisputed that granting the requested preliminary injunction to shut down Delaney Hall would harm the public's significant interest in enforcing this

33

country's immigration laws.  On March 15, 2025, Congress passed—and President Trump signed into law—a continuing resolution that significantly increased funding to support "U.S. Immigration and Customs Enforcement—Operations and Support." Pub. L. No. 119-4, 139 Stat. 9, 27 (2025).  President Trump has likewise consistently announced that immigration enforcement is a top priority for the federal government. *See* President Donald J. Trump, *Protecting the American People Against Invasion* (Jan. 20, 2025), https://tinyurl.com/yauyxxks.  Through these actions, among others, the federal government has announced an enhanced public policy interest in immigration enforcement, including through the funding of additional domestic immigration detention facilities required to support those enforcement efforts.  *Id.* ("Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States.").  As recently as April 1, 2025, ICE has called for proposals from contractors for new detention facilities, transportation, security guards, medical support, and other administrative services.  *See Emergency Detention and Related Services Strategic Sourcing Vehicle*, SAM.gov, https://tinyurl.com/2bzhs6nm (last visited Apr. 15, 2025).

Newark has made its contrary intention crystal clear:  it intends to thwart these national priorities through the admittedly selective enforcement of local and state laws "***regardless of the process***," further underscoring the harm to public interest and federal policy that would result if such an injunction were to issue.

34

**D.    If The Court Issues A Preliminary Injunction—And It Should Not—Newark Should Be Required To Post A Bond In The Amount Of At Least $60 Million**

For all of the reasons just stated, the Court should deny Newark's motion for a preliminary injunction.  But if the Court were to hold otherwise, Newark should be required to post a bond in the amount of at least $60 million—which is a modest amount on these facts given that the $60 million figure accounts solely for one year of lost revenue, which would be the minimal harm caused by the improper granting of a preliminary injunction here.  Martin Decl. ¶ 5.

Federal Rule of Civil Procedure 65(c) states that "[t]he court may issue a preliminary injunction … *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." (emphasis added).  The mandatory language of Rule 65(c) admits no exceptions and is dictated by the nature and context of preliminary injunction procedures.  "[T]here are important policies undergirding a strict application of the bond requirement in most injunction granting contexts." *Instant Air Freight Co.*, 882 F.2d at 804-05 n.9.  "'An incorrect interlocutory order may harm defendant and a bond provides a fund to use to compensate incorrectly enjoined defendants.'"  *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990) (citation omitted.)  Protections afforded to defendants by Rule 65(c) are necessary in the preliminary injunction context for "'because of attenuated

procedure, an interlocutory order has a higher than usual chance of being wrong.'" *Id.* (citation omitted).  A municipality like Newark—which is "clearly not an agency of the United States"—is not exempt from this mandatory bond requirement. *Waterfront Comm'n of N.Y. Harbor v. Constr. & Marine Equip. Co.*, 928 F. Supp. 1388, 1405 (D.N.J. 1996).

The courts in the Third Circuit have interpreted Rule 65(c) strictly.  *See Elliott v. Kiesewetter*, 98 F.3d 47, 59-60 (3d Cir. 1996); *Hoxworth*, 903 F.2d at 210.  In *Hoxworth*, the District Court entered a preliminary injunction against the defendant without requiring the plaintiffs to post a security bond.  903 F.2d at 209.  The District Court excused the bond requirement because it found that "there [was] no risk of monetary harm to the defendants" in complying with the preliminary injunction and "because of the chilling effect such a requirement would have on the plaintiffs' ability to proceed with this case."  *Id.* The Third Circuit reversed and vacated the injunction.  *Id.* (internal quotation marks and citation omitted).  The Third Circuit noted that "[g]iven the text and policies of rule 65(c), this court has interpreted the bond requirement very strictly.  No Third Circuit case of which we are aware has upheld a district court's excuse of the requirement."  *Id.* at 210.  In vacating the injunction, the *Hoxworth* court relied on *Frank's GMC Truck Center, Inc. v. General Motors Corp.* that stated as follows:

> Although the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary.  While there are

> exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory.  We have held previously that absent circumstances where there is **no risk** of monetary loss to the defendant, the failure of a district court to require a successful applicant to post a bond constitutes reversible error.

847 F.2d 100, 103 (3d Cir. 1988) (emphasis added); *see also Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1145 (3d Cir. 1977) ("[A] district court commits reversible error when it fails to require the posting of a security bond by the successful applicant for a preliminary injunction[.]"); *Atl. City Coin & Slot Serv. Co. v. IGT*, 14 F. Supp. 2d 644, 673 (D.N.J. 1998) ("[T]he failure of a district court to require a successful applicant to post a bond constitutes reversible error[.]")

The *Hoxworth* court also concluded that the District Court's determination that there was no risk of monetary harm to the defendants was clearly erroneous. 903 F.2d at 210.  Also, it determined that the District Court's concern over the chilling effect of the bond on the plaintiffs' ability to proceed with their case could not justify excusing the bond requirement.  *Id.* at 211.

The amount of the bond is left to the District Court's discretion.  *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3rd Cir. 2010).  When determining the amount of the bond, the Court "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

Therefore, the amount of security to be set by the judge usually covers the potential incidental and consequential costs in addition to "either the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained." 11A Charles Alan Wright & Arthur R. Miller, Fed. Practice & Proc. § 2954 (3d ed. 2025). The district court should "err on the high side" when setting the bond amount. *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888, *amended on recons.*, 209 F.3d 1032 (7th Cir. 2000). "[A]n error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.* (citing *W.R. Grace & Co. v. Loc. Union 759*, 461 U.S. 757, 770 n.14 (1983)).

In this case, as has been publicly reported, GEO's contract with ICE is for 15 years, with an expected annual revenue of at least $60 million per year. *See* Martin Decl. ¶¶ 4-5. GEO, however, is not asking Newark to post a bond in the amount of the full contract. Rather, GEO is asking for Newark to post a bond in the amount of $60 million, which would encapsulate merely one year's expected annualized revenue. *Id.* ¶ 5. Because GEO's remedies under the law of the Third Circuit are limited to the actions on the bond, this minimal amount of a bond is warranted here. *See Instant Air Freight Co.*, 882 F.2d at 804-05 ("An incorrect interlocutory order

may harm defendant and a bond provides a fund to use to compensate incorrectly enjoined defendants." … "It is true that a bond may create a barrier to the granting of a preliminary injunction.  The barrier fulfills one of the purposes of the bond requirement.") (citation omitted).

## IV.    CONCLUSION

For the foregoing reasons, GEO respectfully requests that the Court deny Newark's motion for a preliminary injunction.

Dated: April 15, 2025                    DAVIS WRIGHT TREMAINE LLP

By:*/s/ Geoffrey S. Brounell*
    Geoffrey S. Brounell

1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
geoffreybrounell@dwt.com

Nicole Phillis (admitted *pro hac vice*)
Mark C. Burnside (admitted *pro hac vice*)
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071-3487
nicolephillis@dwt.com
markburnside@dwt.com

THE GEO GROUP, INC.

Scott A. Schipma (admitted *pro hac vice*)
Joseph Negron, Jr. (admitted *pro hac vice*)
4955 Technology Way
Boca Raton, FL 33431
scott.schipma@geogroup.com
jnegron@geogroup.com

*Attorneys for Defendant*
*The GEO Group, Inc., incorrectly sued as*
*GEO Re-Entry Group, LLC*